Filed 4/3/26  P. v. Jimenez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH JIMENEZ,<br><br>　　Defendant and Appellant. | D086918<br><br><br>(Super. Ct. No. RIF2103205) |

APPEAL from a judgment of the Superior Court of Riverside County, Timothy J. Hollenhorst, Judge.  Affirmed.

Jill M. Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

Joseph Jimenez had been diagnosed with schizophrenia, in addition to several other mental illnesses, and had a history of experiencing auditory

hallucinations. In July 2021, he attended a movie with three of his friends. The only other people in the theater were Rylee Goodrich and Anthony Barajas, who were sitting several rows in front of Joseph and his friends.[1] Partway through the movie, Joseph retrieved a gun from his car. Shortly before the movie ended, Joseph's friends left the theater because he was acting strangely, and they felt uncomfortable. Joseph and his friends had never interacted with the couple in front of them, but as the movie credits began to roll, Joseph shot Goodrich and Barajas in the back of their heads, took Goodrich's wallet, and fled the theater.

Joseph pled not guilty by reason of insanity. During the bench trial, Joseph testified that he had heard voices he thought were coming from Goodrich and Barajas telling him they were going to get or kill him and his friends and family. Although he struggled with the decision, he felt he had no choice but to kill them before they harmed his loved ones. Joseph offered the testimony of two expert forensic psychologists who opined that this delusion overrode his sense of morality and, thus, he was not legally sane at the time he committed the murders. The prosecution did not elicit any expert testimony. The trial court found that Joseph was sane at the time he committed the first degree premeditated murders and sentenced him to life imprisonment without the possibility of parole for the murders plus 50 years to life for two firearm enhancements.

On appeal, Joseph contends the evidence that he was insane at the time of the murders was of such weight that the trial court could not have reasonably rejected it, particularly where the People presented no

---

[1] Because Joseph has the same surname as several of his siblings who provided testimony during the trial, we use his first name for clarity. No disrespect is intended.

contrary medical testimony. In his view, the sanity finding was further based on the trial court's erroneous belief that his insanity defense required an objective basis for his delusional beliefs. Accordingly, Joseph argues the court's finding was not supported by substantial evidence.

Under California's governing standard for determining sanity, if someone suffers from a delusion that causes them to believe others present an imminent threat to their life or the lives of others, they can be found legally insane if the facts as they perceive them would legally justify acting in self-defense or defense of others. Because the court could find that Joseph's delusions as he described them did not present a threat of *imminent* harm to himself or others, it could properly conclude they did not justify the killings so as to absolve him of legal responsibility. Accordingly, we conclude substantial evidence supports the trial court's finding that Joseph was sane and affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

A. *Joseph's Family and Medical History*

Joseph was the youngest of seven children, with six older sisters. One sister, Rosa, described it as a close family and said Joseph was a playful, funny, and caring child. His sisters described him and their mother as inseparable. Joseph's mother developed health problems during his early preteen or teen years, and he would help take care of her. He was not as close to his father, who was an alcoholic and verbally abusive. Sometimes he would stand up to his father when he thought his father was out of line.

In the summer of 2019, Joseph's mother developed a serious infection and was on life support for two weeks. Joseph became quiet and angry during this time. After the hospital discharged her and she went to stay with another sister, Rosa described Joseph as being reclusive, depressed, and

3

quiet.  Another sister, Xochitl, said he stopped eating and probably lost 90 pounds.

Joseph's mother suffered a severe heart attack in July 2020 that left her brain dead, although she was kept on life support for some time.  Joseph was 19 years old at the time.  Sister Daisy said Joseph started talking to himself, and she became alarmed when he started saying, "They're following me.  They're going to kill me" each time a car passed.  When Rosa saw Joseph in August, she said he was acting "weird" and "paranoid."  He rambled nonsensically and asked her to kill him.  He also told her there were people outside and then went out in the street and, "talking to nobody," said, "I know you're looking at me.  I'm right here.  Come and get me."  She recalled him talking about the Crips and the Bloods coming to cut him into pieces, although to her knowledge, no one in the family had any gang affiliation.  Rosa called 911.

Based on what she was told, Rosa drove Joseph to Pacific Grove Hospital on August 3, 2020, and he agreed to be admitted.  Doctors there diagnosed him with major depressive disorder, single episode, with psychotic features.  They noted he presented with worsening paranoia and thought disorganization, believing people were out to kill him.  Joseph recalled thinking people at the hospital were going to kill him for his organs and body parts.  For that reason, he left against medical advice on August 8.

Joseph slept on a roof and was out on the streets until Daisy found him two days later.  He expressed surprise, and the first thing he said to her was "I thought they killed you guys all."  He appeared stressed, anxious, manic, and tired and was still saying nonsensical, paranoid things, so Rosa took him to Loma Linda University Behavioral Medical Center.  Joseph said he had lost 180 pounds.  Someone mentioned his excess skin at admission, and he

4

became nervous they would take his skin for the black market. The staff diagnosis was "[c]annabis-induced psychotic disorder with moderate or severe use disorder with delusions" and prescribed medications to stabilize his mood, aid in thought clarity, and help with insomnia.

Joseph was discharged from Loma Linda seven days later and moved back in with his father. At some point in August, Joseph told two of his sisters that they needed to kill him so they could have the money before others came and turned him into a paraplegic.

Joseph's mother died on December 23, 2020. Another sister, Cynthia, and her children came to stay with him and his father. Five days later, Joseph tried to kill his father. Cynthia heard her father struggling in the other room and ran out to find Joseph choking him on the floor. As she grabbed Joseph to pull him off, she described his face as blank. When she asked him what was going on, he told her their father was trying to molest her daughter, which she said never happened. Cynthia called the police.

Responding officers detained Joseph on a Welfare and Institutions Code section 5150 hold following Cynthia's report that her brother was holding a knife and possibly schizophrenic. Officers took him to Riverside University Health System, where he was diagnosed with schizophrenia, cannabis dependence with psychotic disorder, and major depressive disorder. Joseph told staff he was a Crip and his father was a Blood, and therefore he had to kill his father. He was discharged on January 5, 2021.

Rosa spoke with a case worker about getting her brother admitted to a facility for long term help. In February 2021, Daisy took Joseph to a facility in Long Beach, where he reported that "[t]he voices are telling me to kill people . . . [but] I don't want to kill anyone" and that the voices had told him to kill his father. They diagnosed him with schizoaffective disorder, bipolar

5

type.  He was transferred to Southern California Hospital at Van Nuys but discharged four days later.

In May or June 2021, Xochitl recalled being at a restaurant, and Joseph kept looking over his shoulders and saying people were staring at him, although he was not sure what they wanted.  Another time, Joseph said someone was coming after him and was going to cut his limbs.  Xochitl once heard him say, "I can't do that.  I can't do that. . . . No, I can't do that.  That's my sister.  No."

Due to declining health, his father moved to Mexico in early July 2021, leaving Joseph alone.  The father passed away the next month.

## B. *Joseph Shoots Goodrich and Barajas at the Movie Theater*

On the evening of July 26, 2021, Joseph met up with three friends—Carlos G., Julian V., and Ramon F.—at a restaurant in Corona, California.  Ramon said when Joseph arrived at the restaurant, he told Ramon he had a "strap" in his satchel, referring to the gun.  Ramon did not believe him because Joseph had been saying many things that did not make sense over the preceding days.  While they were at the restaurant, Joseph never indicated anyone was threatening him or expressed concern for his friends' safety.  But he mumbled, gave strange responses to conversation, stared off, and acted weirdly when it was time to pay.

When they reached the theater building, Carlos told Joseph he did not think Joseph needed his bag because he did not think bags were allowed in the theater.  He did not ask what was in the bag, and Joseph returned it to his car.  Carlos and Joseph walked to the concession counter while the others went to the restroom, and Carlos presented their tickets to the young female employee.  Carlos heard Joseph ask the woman for her phone number.  He

6

walked away when she started providing her number, and he thought Joseph was still talking to the girl when he returned from the restroom.

Eventually they entered the theater, walking past the only other two people there, later identified as Goodrich and Barajas. Joseph and his friends sat in the back row. After they had been in the theater for about 15 minutes, Joseph switched to the seat to the left of Carlos. He did not explain why, but Carlos could hear him mumbling constantly to himself. Carlos asked if he was okay, and Joseph said he was fine. Joseph then half turned his body toward his friends and mumbled in their direction. Carlos heard him say, "I can't do this this to them" a few times.

Ramon also noticed that Joseph continued to shift his attention between the screen and the three friends. Eventually he fixated just on his friends and seemed to Ramon to be directing all his mumbling and staring at them. Ramon waved his hand in front of Joseph and pointed at the screen, but Joseph did not respond.

About an hour to an hour and a half into the movie, Joseph stood up and left without saying anything. He walked down the stairs past Goodrich and Barajas, but did not interact with them or walk with any sense of urgency. While he was gone, Carlos told Julian and Ramon he felt uncomfortable because Joseph had been mumbling in his ear the whole time. Joseph returned 10 to 15 minutes later, again walking normally. He did not react to the couple or interact with them in any way as he passed.

Joseph returned with his bag. He sat and stared at an area right in front of where they were sitting, although not at Goodrich and Barajas. Ramon was concerned for his safety, so he took Joseph's bag and passed it down to Carlos. After the bag was passed around for a bit, Joseph stood up and said, "I'm going to leave." Ramon returned the bag thinking Joseph

would leave, but then he sat back down and put his hand in the bag. He kept looking between the movie and his friends, and Carlos heard him say, "I can't do this to them" one more time. Ramon felt "weirded out" so he said he was going to the restroom and left. Carlos had also started feeling uncomfortable and unsafe around Joseph, so he told Julian he was leaving. Carlos then told Joseph they were going to check on Ramon and asked if he wanted to join them. Joseph said no, and they left. Ramon did not recall Joseph ever signaling to them to leave.

Carlos went home, and Ramon and Julian drove to another area of the parking lot to watch and see if Joseph left. About 15 minutes later, Joseph sprinted out of the theater, got in his car, and peeled out, running stop signs on his way.

The movie ended at about 11:40 p.m., and an usher discovered Goodrich and Barajas. Both had been shot in the back of their head. Goodrich was sitting upright, and Barajas was on the ground. The manager called 911, and the operator instructed them to lay Goodrich flat so they could attempt to resuscitate her. By the time they laid her down, emergency responders had arrived and took over. Goodrich died at the scene. Barajas was transported to the hospital and later succumbed to his injuries.

After hearing about the shooting the next day, the three friends decided to go to the police and let them know Joseph had been "acting weird" during the movie.

The next morning, Joseph sent a text message to four of his sisters and his father reading, "Watch out, hell's blood." It did not make sense to Rosa, so she called him. Joseph was very energetic and asked if he could come over because he needed to talk to her. She said he asked, "Are you guys okay? Just want to make sure that you're okay. You know, just making sure that

8

they haven't got you. How are the kids? Are the kids good?" Rosa reached out to Daisy, who agreed to go pick him up and take him to another mental institution. When she arrived, Joseph was in the middle of the road saying there were trucks following him. He appeared stressed, unfocused, confused, and scared, and was carrying a BB gun. He said, "They're following me," but he did not clarify who he was referring to. She called 911 and turned him over to police with an explanation about his mental health issues, not knowing what he had done.

## C.   *Joseph's Testimony*

Joseph testified that he started using cannabis at age 16 and usually smoked or vaped three to four times daily. He had three jobs after high school but was fired from one for smoking marijuana at work.

At some point after getting fired, Joseph started feeling like people were following him every time he drove somewhere. Then, after using cannabis, he started hearing voices from outside his apartment and seeing lasers in his room. Joseph continued to hear voices and concluded that their names were Ryan and Abigail. The female voice helped him, but the male voice scared him.

After the first two hospitalizations, Joseph recalled being prescribed two medications, but said he did not think they worked because he still heard voices when taking them. As a result, he did not always take them as prescribed. He claimed he stopped smoking marijuana until the morning of December 23, 2020, when his mother passed away.

Joseph explained that he attacked his father because the voice he called Abigail told him he needed to kill his father, or someone would get him and his family. Initially, Joseph grabbed a kitchen knife but then put it down because "[t]hat's something that you don't do" to your father. Instead, he

9

decided to choke him with a broom handle, which he thought would be less painful. His father pushed him away, so he tried again with his hands. He cried the whole time because he did not want to hurt his father. He remembered Cynthia telling him to stop, but he did not recall her pulling him off his father or having said his father was going to molest Cynthia's daughter.

After being released from Riverside Hospital, Joseph returned to the apartment alone. His father had moved out, ultimately moving to a trailer on the same property. Eventually, he moved into the trailer with his father. He took his medication for a few months but then stopped. He was hearing voices and seeing red dots again.

Joseph described the day before the shooting as a regular day, although he did hear more voices than usual. On July 26, 2021, he went out to eat with his friends Carlos, Ramon, and Julian. He recalled telling his friends he heard a male voice in the kitchen making food and that the guy was out to get him. He had his satchel with him; inside the satchel was a gun loaded with seven rounds. About a month earlier he bought the pistol online along with a drum magazine capable of holding 50 to 100 bullets. He wanted protection from the voices and the people who were following him. He testified that he knew it was "completely wrong" to purchase the gun and to carry a concealed weapon, but he did it anyway even though the voices were not telling him to buy them. He had been regularly carrying the gun with him.

Joseph went with his friends to the movie theater, but he testified that he did not pay attention to the movie because he was listening to and talking to the voices he was hearing. A voice told him that if he did not kill "us"— meaning the people sitting in front of him in the theater—they were going to

10

kill Joseph's friends and family. Joseph looked to his right every time he heard this threat and said Carlos would nod his head like he was saying yes. Because he felt threatened, Joseph retrieved his gun from the car and sat with his hand on the gun inside the bag. At that point, he started seeing lasers on the theater walls.

He continued to hear voices threatening him, and he offered conflicting testimony about whether the voices were coming from the male and female sitting three to four rows in front of them or from Abigail and another unknown voice near the couple. They did not turn around, and he never interacted with them. Joseph did not really know what to make of it, but he said he was not afraid of the victims. On the other hand, he said he felt uneasy because they were making threats, and he thought the laser dots may have been from handguns the victims were carrying. When asked if he felt the voices "were expressing a sense of urgency" at that point, he responded, "No."

Joseph made a motion with his head to his friends to indicate they should leave because he had decided what he was going to do to the people in front of them. He had the impression his friends were anxious and scared, and Ramon took the gun away from him. However, Joseph eventually grabbed it back.

According to Joseph, the voices and red dots stopped toward the end of the movie. When the movie credits started and the lights turned on, he fired his pistol. He said he did not do it until the end of the movie because he was struggling mentally with whether to kill them or not. He did not remember if he felt he had a choice because he said the hallucinations were worse at night and had prevented him from sleeping for a couple of weeks. He later

acknowledged that part of the reason he had not been sleeping was he was consuming a lot of energy drinks.

Defense counsel asked if, outside of this context, Joseph knew that killing people was bad, and Joseph said, "Yes, I do." Then counsel asked why he felt it was okay in this case. Joseph replied, "I wouldn't say I felt it was okay, it's just it just had like—it was just like, how do I say this? The lack of sleep and insomnia, so I wasn't really like clearly picturing it." He did "not necessarily" feel like they were a threat up until the point when he shot them but said he "wasn't thinking." He repeatedly said he was "in the heat of the moment." He did not believe he had to shoot them, but rather it was an idea the voices gave him, and he said it was a choice he made after struggling with the decision. At one point during his internal debate, he started crying. He acknowledged that part of the reason he was crying was because he knew it was potentially morally wrong to kill people. When asked if it felt the same as playing a shooter video game, Joseph said it felt different and real.

He said he shot the male first because he was closer and then shot the female and grabbed her wallet. Later, he amended his answer and stated that he shot Goodrich first. He thought he recalled the wallet being on the ground and said it was just a "sudden reaction" that made him grab it. He offered conflicting testimony as to whether he had to step over Barajas—who at some point started screaming and crying—to reach the wallet. He admitted he knew when he took the wallet that he had shot two innocent victims. He saw the female victim moving, so he fired another shot before running out.

After shooting them, he experienced "a lot of adrenaline," and felt nervous and scared. He ran because he "knew what [he] did was not right." He ran out a fire exit to his car and drove home. At some point, he removed

12

cash from Goodrich's wallet and put it in his own wallet. When his attorney later asked if he took the wallet because he wanted to know who the people were that he had just shot, he replied, "Not really."

Later that evening, the voices started again and told him to go to downtown Los Angeles and rob people, although he did not obey them this time. He said he was not concerned when his sister later called the police because he "was not in the right state of mind" and "wasn't thinking." He said he did not feel anything when the police arrived.

Regarding both the shooting and the strangling of his father, Joseph said he knew beforehand that the conduct was wrong, but he committed the acts anyway because the voices made him feel he and his family were being threatened. After he shot the people in the theater, however, he did not feel at all relieved or like the problem had been solved. He said three or four days later, he felt remorse, regret, and guilt.

Police officers interrogated Joseph on July 27. He explained that he was not initially honest with the police because the voices were telling him he did not do it. Eventually he was honest with the police. He knew he had done something wrong.

Although Joseph said he last smoked marijuana the day his mother died and had given up alcohol, the prosecution showed videos of Joseph vaping marijuana and drinking on several occasions between January and July of 2021.

## D.    *Initial Charges and Pleas*

The District Attorney of the County of Riverside charged Joseph with two counts of first degree murder while lying in wait. (Pen. Code,[2] §§ 187, subd. (a), 190.2, subd. (a)(15).) As to each count, the information alleged a

---

[2]    Undesignated statutory references are to the Penal Code.

multiple murder special circumstance (§ 190.2, subd. (a)(3)), and that Joseph intentionally and personally discharged a firearm causing death (§§ 12022.53, subd. (d), 1192.7, subd. (c)(8).) Joseph initially pled not guilty and not guilty by reason of insanity as to both counts, but subsequently entered a new plea of not guilty by reason of insanity. He waived his right to a jury trial on both the issues of guilt and sanity and admitted the allegations against him.

## E. *Dr. Jennifer Bosch's Testimony*

Defense counsel first offered the opinion of Dr. Jennifer Bosch, a forensic psychologist with 24 years of experience working with the courts and examining criminally accused individuals. After reviewing Joseph's medical records from five mental health-related hospitalizations, police reports, witness and family statements, jail records, and the results of her own examination and testing, Bosch diagnosed Joseph with schizophrenia, generalized anxiety disorder, and cannabis use disorder. She did not find any indication of sociopathic tendencies or narcissism. She indicated that one test placed him at a borderline level for malingering but said that ultimately her review of his patient history and other materials ruled out malingering.

Dr. Bosch explained that the positive symptoms of schizophrenia include hallucinations, delusions, paranoia, disorganized thoughts, and disorganized behavior. Negative symptoms include having a flat and blunted affect, using fewer words to articulate thoughts, lacking the ability to feel and experience pleasure in activities the individual previously enjoyed, and lacking interest in socializing. She explained that medication generally helps stop the positive symptoms but often does not alleviate, or even worsens, the negative ones.

14

Schizophrenia also leads to cognitive impairments. Dr. Bosch listed memory impairment, inability to focus and concentrate, and impaired reasoning and decisionmaking as examples. She said part of the inability to focus stems from the fact they are attending to the "clutter," such as voices, occurring internally. According to Bosch, the age of onset in males is typically around 18 to 20 years old.

Stress, including the death of a parent, and drug use can trigger the onset of schizophrenia. Although chronic marijuana use can cause similar psychosis, Dr. Bosch explained that the symptoms diminish when the person is no longer using, whereas they do not with schizophrenia. She also noted that people with drug-induced psychosis typically report more paranoia and visual hallucinations and have some insight into the behavior, while those with schizophrenia experience more voices and disorganized behavior. But cannabis use disorder can accentuate paranoia, delusions, and some of the negative symptoms of schizophrenia. Bosch opined that Joseph lacked insight into his mental illness; he did not believe that he suffered from a mental illness or needed medication.

In Dr. Bosch's view, schizophrenia was a major contributing factor to the assault on his father. She noted he experienced command hallucinations and was not able to ward off the voices. When presented with a hypothetical based on the assault where Joseph struggled with whether to do it, Bosch opined that Joseph knew what he was doing and knew the act was morally wrong. But because of these firmly held delusional beliefs and voices, he felt he had no choice but to engage in that behavior despite knowing that the acts were not lawful. When asked to consider the same hypothetical where the command voices told him that if he did not kill his father, his father might

kill him or his family, Bosch believed Joseph could decide it was the morally right thing to do even though it was legally wrong.

Turning to the night of the movie, Joseph's testimony that he was only able to focus five percent of his attention on the movie indicated to Dr. Bosch that his schizophrenia symptoms were active—there was so much going on internally that he could not attend to the outside world. She explained that lack of sleep can exacerbate symptoms of schizophrenia, and said she was aware Joseph had been sleeping very little in the days leading up to the shooting.

Dr. Bosch believed that Joseph made the decision to end two people's lives because he felt there was a threat of more dire consequences if he did not do so. When asked if her opinion would change if Joseph realized seconds later that the individuals he shot were innocent, Bosch said no. She said he weighed the consequences, did not feel he had a choice, and believed he was doing the morally right thing. The fact that he ran from the scene afterward did not change her view because he knew that killing was legally wrong and would have consequences, but he still viewed it as the less morally wrong path.

Dr. Bosch acknowledged that Joseph did not tell the detectives who interviewed him after the shooting that he heard voices. But he did tell them he took Goodrich's wallet because he wanted to know who was threatening him. The prosecutor then offered Bosch a hypothetical in which Joseph realized after shooting Goodrich and Barajas that they were innocent and what he did was morally wrong, but he stepped over a screaming Barajas to pick up the wallet before sprinting out of the theater, leaving, and removing Goodrich's money from the wallet. Counsel asked if Joseph was acting under a delusion regarding taking the wallet. Bosch expressed confusion as to

whether the hypothetical was meant to exclude what Joseph had said to her. The prosecutor said yes, and told her "There were no voices telling, prompting him to do this, to take the wallet, okay?  There is no—there is no delusions that he's—somebody's following him or there's some sort of threat around him.  There is no evidence of any paranoia whatsoever."  He said they were just talking about taking the wallet.  She responded that she would argue from his statements that "there was some paranoia there" and "you can't turn on and off."  When asked if she could give an opinion, she said, "my opinion would be contaminated knowing what was told to me, knowing that we have cognitive limitations, knowing all the studies on memory just for the basic everyday person, and we're talking two years later, I would be hard pressed to answer that question."  She elaborated that her struggle was with answering a hypothetical where the person never had a mental illness.

The next day, the prosecutor posed the hypothetical again, and Dr. Bosch asked, "do we know anything about previous mental health issues?"  The prosecutor replied that the hypothetical was about Joseph, as she believed him to be, with delusions, hallucinations, and schizophrenia. Under those circumstances, she said she would have had a discussion with Joseph about why he took the wallet.

On redirect, defense counsel asked about the hypothetical to the extent it asked her to consider the impact of the hallucinations stopping 10 to 15 minutes before the shooting.  Dr. Bosch explained that delusions are fixed beliefs, despite evidence to prove the contrary, and that a person under a delusion will say the contrary evidence has been tampered with or is false. So, even if there are periods when the voices stop, the delusional ideation continues.

17

Defense counsel also asked whether Joseph's generalized anxiety disorder further complicated his cognitive function and ability to recognize other options such as calling 911, talking to security, or leaving the theater. Dr. Bosch said it absolutely did—that he experienced a buildup of pressure and anxiety and felt this was the only option, even though he was not necessarily happy about the option. Just as with the attack on his father, she said his mental defects overrode his sense of morality. In her view, Joseph unquestionably met the legal requirements for insanity—she did not consider this case a close call. Given his history, the records, her interview, and his presentation, she also ruled out robbery as a motivating factor for the crimes.

## F.  *Dr. Harry Goldberg's Testimony*

Defense counsel next offered the testimony of Dr. Harry Goldberg, a psychologist who had worked on court-related forensic psychology matters since 1986 and interviewed over one thousand individuals who had pleaded not guilty by reason of insanity to criminal charges or already been adjudicated legally insane. Goldberg noted that he testifies on behalf of the prosecution 90 percent of the time.

Dr. Goldberg diagnosed Joseph with schizoaffective disorder, depressed type, and moderate cannabis use disorder. He explained that schizoaffective disorder is different from schizophrenia in that, besides just having a thought disorder, the individual has depression or mania. He indicated that marijuana use can trigger or activate schizophrenia and can then exacerbate the thought disorder and affective symptoms like depression. Like Dr. Bosch, Goldberg said Joseph's sleep disorder could also exacerbate the symptoms of his thought disorder. He found very little evidence of any antisocial personality condition. He agreed losing his mother may have accelerated the

18

onset of Joseph's schizophrenia, but said he would have developed it at some point.

Dr. Goldberg believed Joseph had a general framework of morality. With regard to the attack on his father, he thought Joseph struggled with the morality of killing somebody and not really wanting to do so, but also with the higher morality of believing that if he did not, something more terrible would happen. In other words, because he was acting in defense of his family, his schizophrenia overcame his usual sense of morality.

As to the night of the shooting, Dr. Goldberg opined that even though the hallucinations may have stopped, Joseph still experienced the threat and feeling of being compelled to act. In his view, Joseph's history demonstrated that he would not likely ask for help or call 911 because it was not something he usually did, and he was lost in his own distorted thoughts and perceptions of reality. When asked if Joseph's painful deliberations that even brought him to tears indicated to him that Joseph was struggling with the morality of it, he said yes. But in the moments leading up to the offenses, Goldberg did not believe Joseph had the ability to accurately discern between right and wrong. He explained that in cases like this, he did not usually get an accounting of how the individual was acting right before the incident. But here, his three friends indicated he was acting in a very unusual manner that made them afraid for their lives. Given all the evidence of his mental state prior to the crime, Goldberg did not view this as a borderline case as to whether Joseph met the standard for the criminally insane.

It did not change his opinion to learn that Joseph stated he felt sadness and even regret immediately after shooting the people. While witnessing what presumably was a gruesome scene could have changed his state of mind briefly, Dr. Goldberg noted that Joseph was still hallucinating about robbing

19

someone later that evening and demonstrating psychiatrically unstable behavior with his sister the next day.  He did not think this indicated Joseph knew he was doing something wrong at the moment he committed the act.

When asked if the fact that Joseph took the wallet and removed money from it changed his opinion as to what caused him to kill the victims, Dr. Goldberg said no.  He did not believe it created a more probable motive than schizophrenia because Joseph did not take Barajas's wallet or possessions and it was not a logical way to rob someone, so it simply demonstrated the bizarre nature of the crime.

On cross-examination, the prosecutor asked him, over defense objection, to assume a hypothetical where the voices were instead telling Joseph to rob the female and kill them to get a wallet and asked if Joseph would know that was morally wrong to do.  Dr. Goldberg responded that it would not rise to the level of insanity because it was not something Joseph had to do to protect himself or his family.  Through several additional hypotheticals, Goldberg clarified that an insanity finding required the individual to be committing the crime of killing someone to defend themself or their family.  The prosecutor implied the incident with his father was different because the voices were incessant and Joseph believed there was an imminent threat of great bodily injury or death, whereas the voices had ceased at the theater.  But Goldberg viewed that situation as "exactly parallel" to the shooting in that Joseph did not think there was "a way out" except to kill.

What carried the most weight for Dr. Goldberg was the objective evidence of Joseph's behavior versus his statements.  He observed that Joseph was very passive and wanted to please people, so his answers to open-

20

ended questions were more likely to be accurate. He did not strike Goldberg as deceptive or callous or manipulative.

## G.   *The Trial Court's Decision*

The trial court began by acknowledging there was no dispute that Joseph suffers from schizophrenia and has a well-documented history of hallucinations, delusions, mania, and depression. Although it recognized that Joseph was not regularly taking his medication and made his mental health issues worse with habitual marijuana consumption, the court stated that Joseph's use of drugs had no impact on its findings.

In deciding whether Joseph was capable of knowing and understanding that his act was wrong, the evidence of Joseph taking Goodrich's wallet shortly after the killings "had a significant impact" on the court's findings. It noted there was no break in the chain between when he fired the shots and when he walked by or over Barajas, who was still alive, to retrieve Goodrich's wallet before running away. Of interest to the court was how this information impacted the experts' opinions that Joseph was not capable of knowing that the shooting was morally wrong. The court explained that Dr. Bosch said she could not answer because her opinion was contaminated by the fact that Joseph had told her something different about his motivation in taking the wallet. Because she was unable or reluctant to offer an opinion about a fact the court found significant, the court assumed her ultimate opinion had changed and discounted her ultimate opinion accordingly.

As to Dr. Goldberg, the court said he simply asserted the fact did not weigh heavily in his opinion. The court indicated it could not understand how committing a separate crime did not affect the expert's opinion one way or the other. In the court's view, either a delusion told Joseph to take the wallet or it was a thoughtful action because he wanted or needed money (or

21

had some other reason the court would not speculate about). In stating that the wallet aspect of the crimes had little bearing on his opinion, the court found Dr. Goldberg undermined his own credibility.

In addition to the signs of Joseph's mental illness surrounding the events, the court:

> "considered the circumstances before, during, and after the offenses, including the defendant's seemingly normal interaction with a female concession stand worker at the movie theater shortly before the shooting; his physical actions of gesturing his friends to leave the theater prior to shooting because, in his words, he knew he was going to do something; fleeing the theater through the emergency exit immediately after the killings; racing out of the parking lot, as well as a wide range of statements the defendant has made that included not saying anything about hearing voices to law enforcement shortly after his arrest for these crimes."

In rejecting the theory that Joseph acted in self-defense, the court used *People v. Leeds* (2015) 240 Cal.App.4th 822 (*Leeds*) for guidance. However, because Goodrich and Barajas were facing away from Joseph and never had any contact with him, the court found "there is not a shred of objective evidence to show that Mr. Joseph was in imminent danger of death or great bodily injury from Barajas or Goodrich."

The court also rejected the self-defense claim because Joseph testified the voices that he heard threatening him did not even belong to Barajas and Goodrich and, although he said he shot at Goodrich twice because she was still moving after the first shot, he only shot Barajas once even though he clearly was not deceased after the first shot. Moreover, the court noted that when his own attorney asked why he committed the murders, Joseph said it was due to lack of sleep, it was in the heat of the moment, he was not

22

thinking, and he struggled with the decision because he knew it was wrong to kill people.

After weighing the evidence, the court concluded Joseph understood the moral wrongfulness of his actions and failed to meet his burden of proving insanity.

The court sentenced Joseph to life without the possibility of parole for the two murders plus enhancements to each count of 25 years to life for personal use of a firearm.

## DISCUSSION

The only question on appeal is whether substantial evidence supports the trial court's determination that Joseph was sane at the time he committed the murders. We conclude that it does.

### A. *Legal Principles and the Standard of Review*

Individuals who are "mentally incapacitated" are not considered capable of committing crimes. (§ 26.) "Mental incapacity under section 26 is determined by the *M'Naghten* test [*M'Naghten's Case* (1843) 8 Eng.Rep. 718, 722] for legal insanity provided in section 25, subdivision (b)." (*People v. Powell* (2018) 5 Cal.5th 921, 955 (*Powell*).) This test provides that, "[i]n any criminal proceeding . . . in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act [or] of distinguishing right from wrong at the time of the commission of the offense." (§ 25, subd. (b); *People v. Skinner* (1985) 39 Cal.3d 765, 777, 782 (*Skinner*) [concluding that despite § 25, subd. (b)'s use of the word "and," it reinstated the *M'Naghten* test, which requires a defendant to prove one or the other prong of the test to demonstrate insanity].) "[A] defendant may suffer

23

from a diagnosable mental illness without being legally insane under the *M'Naghten* standard." (*People v. Mills* (2012) 55 Cal.4th 663, 672.)

An individual suffering from delusions may be found incapable of appreciating the wrongfulness of his or her conduct. (*Skinner, supra*, 39 Cal.3d at p. 781.) As the judges who first formulated the *M'Naghten* test explained, if the defendant " 'labors under such partial delusion only, and is not in other respects insane, we think he must be considered in the same situation as to responsibility as if the facts with respect to which the delusion exists were real. For example, if under the influence of his delusion he supposes another man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self-defence [*sic*], he would be exempt from punishment. If his delusion was that the deceased had inflicted a serious injury to his character and fortune, and he killed him in revenge for such supposed injury, he would be liable to punishment.' " (*Id.* at p. 781, fn. 13 quoting *M'Naghten's Case, supra*, 10 Clark & Fin. 200, 211 [8 Eng. Rep. 718, 723].)

We review a finding of sanity for substantial evidence. (*Powell, supra*, 5 Cal.5th at p. 957.) A sanity finding is supported by substantial evidence if the appellate court finds, after reviewing the record in the light most favorable to the court's determination, that "it is supported by evidence that is reasonable, credible, and of solid value, from which a reasonable trier of fact could find the defendant sane by a preponderance of the evidence." (*Ibid.*)

## B. *Analysis*

As the trial court recognized, it was undisputed that Joseph suffered from a mental illness and had been diagnosed with schizophrenia. There also appeared to be no dispute at trial as to the first prong of the *M'Naghten*

test—that Joseph knew and understood the nature and quality of his act. (See *Skinner, supra*, 39 Cal.3d at p. 782.) In *Skinner*, the court found evidence supported the trial court's finding that the defendant was aware of the nature and quality of his homicidal act because "[h]e knew that he was committing an act of strangulation that would, and was intended to, kill a human being." (*Skinner,* at p. 778.) Defense testimony here likewise demonstrates that Joseph understood that guns kill people, and that shooting Goodrich and Barajas would end their lives. For example, Joseph testified that he bought the gun for protection. Although a voice told him that if he did not kill Goodrich and Barajas, they were going to kill Joseph's friends and family, he did not shoot them until the end of the movie because he was struggling mentally with whether to kill them or not. In other words, he understood that if he shot them, they would die. Thus, this is not akin to a case where the defendant experienced a blackout and was unaware of what happened. (See *People v. Richardson* (1961) 192 Cal.App.2d 166, 173.) Moreover, Dr. Bosch testified that Joseph made the decision to end two people's lives. Most significantly, Joseph's counsel conceded in his closing argument that the first prong was not grounds for insanity, acknowledging that Joseph knew what he was doing and understood that he was going to kill someone. Therefore, substantial evidence supports the court's conclusion that Joseph understood the nature and quality of his homicidal act.

This leaves the second prong of the *M'Naghten* test as the only path to a finding of insanity. Cases applying *M'Naghten* have delineated two primary routes to an insanity finding based on the defendant's inability to distinguish right from wrong at the time of the crime. First, there are cases like *Skinner* where the defendant knew killing his wife was homicidal, but did not think it was wrong because it was sanctified by God's will and desire.

(*Skinner, supra*, 39 Cal.3d at pp. 770, 783.) No one has argued that a higher power led Joseph to believe the killings were morally justified in this case. He believed the voices belonged to Abigail and an unknown male and concluded they were somehow coming from the people sitting in front of him. Furthermore, he testified that he knew killing people was wrong and, specifically, morally wrong. And Dr. Goldberg conditioned his insanity finding on there being a threat of something bad happening to Joseph or his loved ones, not on the killings being ordained by a higher power.

The second category of cases are those asserting an insanity defense akin to self-defense. As the *M'Naghten* court itself made clear, " 'if under the influence of [a] delusion [the defendant] supposes another man to be in the act of attempting to take away his life, and he kills that man, as he supposes in self-defense, he would be exempt from punishment.' " (*People v. Rittger* (1960) 54 Cal.2d 720, 732 (*Rittger*) quoting *M'Naghten's Case, supra*, 8 Eng.Rep. at p. 723.)

This is the primary argument upon which Joseph's insanity defense appears to rely. The thrust of the argument is that his delusions led him to believe he had to kill Goodrich and Barajas because they had threatened his friends and family. On a few occasions, he also mentioned that the voices had threatened to kill him. "A claim of unreasonable self-defense based solely on delusion is quintessentially a claim of insanity under the *M'Naghten* standard of inability to distinguish right from wrong." (*People v. Elmore* (2014) 59 Cal.4th 121, 140 (*Elmore*).) "Its rationale is that mental illness caused the defendant to perceive an illusory threat, form an actual belief in

the need to kill in self-defense, and act on that belief without wrongful intent."[3]  (*Ibid.*)

The problem here is Joseph's asserted delusional belief that there was a "need" to kill the victims.  Both perfect and imperfect self-defense require an actual belief in the need to defend oneself or others against *imminent* death or great bodily injury.  (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) "To satisfy the imminence requirement, '[f]ear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice.' "  (*People v. Trujeque* (2015) 61 Cal.4th 227, 270.)

The trial court here focused on whether there was objective evidence that Joseph was in imminent danger of death or great bodily injury from Barajas or Goodrich.  That is not the test.  (See *Elmore, supra*, 59 Cal.4th at p. 146.)  More to the point, however, is that here there is substantial evidence to indicate that Joseph did not *subjectively* believe he or his loved ones were in imminent danger.

As an initial matter, Joseph contends there is no imminence requirement where a defendant seeks to prove insanity based on a delusional belief.  He suggests "[t]his is because an insanity defense is based on whether a defendant was incapable of understanding the nature and quality of his act

---

[3]    One standard California jury instruction specifically extends this principal to defense of others.  Based upon *Leeds*, CALJIC 4.06 provides, "In the case of [murder] . . . , if the facts the defendant perceived as a product of the delusion would have justified the exercise of self-defense, or defense of others, the defendant would be not guilty by reason of insanity, if the defendant's acts would have been justified had the perceived facts been real." (CALJIC No. 4.06 (2016).)  The Judicial Council of California Criminal Jury Instructions do not spell out the insane delusion rule in one jury instruction, but do contain instructions covering the concepts of insanity, self-defense, defense of others, and imperfect self-defense.  (See CALCRIM Nos. 3450, 505, 571 (2025).)

or distinguishing right from wrong, and not on the objective characteristics of the delusional threat." Indeed, it appears the trial court made this error in focusing on whether there was objective evidence that Joseph was in imminent danger of death or great bodily injury from Barajas or Goodrich. That again is not the test. (See *Elmore, supra*, 59 Cal.4th at p. 146.)

But that does not mean that imminence is entirely irrelevant, as Joseph seems to suggest. Rather, the imminence of the threat must be assessed not on an *objective* basis consistent with reality, but from the perspective of the defendant's *subjective* belief consistent with his claimed delusion. In the terminology of *M'Naghten,* the adequacy of the threat is assessed based on the facts as the defendant "supposes" them to be.

On this point, *Leeds, supra*, 240 Cal.App.4th 822 is instructive. In *Leeds*, the defendant had been diagnosed with paranoid schizophrenia. (*Id.* at p. 825.) He believed a Mexican drug cartel had infiltrated his family's business and that several of the business's employees were working together to turn it into a drug delivery business. (*Id.* at pp. 826–827.) After hearing voices on the business's walkie-talkies discussing how they were going to kill him, Leeds prepared himself with a gun. (*Id.* at p. 826.)

When his father kicked down the door to the office Leeds was in, Leeds thought he was brandishing a gun and shot him. (*Leeds, supra*, 240 Cal.App.4th at p. 826.) He then located and shot the other three victims—the first was 20 to 30 feet away and walking in the other direction, the second was running away, and the third was sitting on an idling tractor with nothing in his hands. (*Id.* at p. 829.) Afterwards, he fled toward the perimeter of the property, discarded his gun and outer clothing, and attempted to scale a fence. (*Id.* at p. 827–828.) Charged with four counts of first degree murder, Leeds pleaded not guilty by reason of insanity. But a

28

jury found him sane and Leeds appealed, claiming instructional error in the sanity phase.

Consistent with our conclusions, *Leeds* held that "[t]he sanity verdicts turned on whether Leeds actually believed he was defending himself from imminent peril, and thus could not appreciate the wrongfulness of his actions, rather than on whether his belief was reasonable in light of the objective circumstances." (*Leeds, supra*, 240 Cal.App.4th at pp. 832–833.) Agreeing with Leeds that the jury instructions were erroneous, the appellate court found that the error was prejudicial as to only one of the four victims— Leeds's father—because the evidence indicated that only he was shot in response to an *imminent* perceived lethal threat. (*Id.* at p. 833.)

Consistent with *Leeds* and accepting that Joseph was operating under the delusion that Goodrich and Barajas were threatening to kill him and/or his loved ones, the court could find that this threat was not imminent.[4] Joseph's own testimony supported this conclusion. He left the theater 60 to 90 minutes into the movie to retrieve his gun, but did not shoot Goodrich and Barajas until the end of the movie. Joseph said he signaled to his friends during the movie by moving his head to indicate they should leave because he had decided what he was going to do to the people in front of them. But the

4    The prior incident with Joseph's father may have been similar to Leeds's killing of his own father because both victims were directly in front of the defendants and, in their delusional view, posed an imminent threat to them or, in Joseph's case, his loved ones. But the killing of Goodrich and Barajas was more like Leeds's shooting of the other three employees. Joseph observed Goodrich and Barajas to be sitting several rows away and facing away from him. None of Joseph's friends or relatives were in the theater, and he knew he could safely exit as he had already done once before. Joseph's verbal hallucinations had abated, and even though he had already made the decision about what he was going to do, he waited at least 10 to 15 minutes before shooting them in the back of their heads.

voices were not expressing a sense of urgency, and he waited another 10 to 15 minutes—until after the movie ended and while the credits were rolling—before shooting the couple.[5]  He also said the voices stopped before the movie ended, and he did not know what would happen if he refused to kill Goodrich and Barajas.  Finally, although the threats were primarily directed at his friends and family, Joseph knew none of them were present in the theater at that point.  This evidence suggests that although Joseph may have perceived a threat, he did not view it as imminent.

To the extent he felt the voices had threatened him specifically, he could have elected to leave the theater, having done so once already.  Furthermore, Joseph acknowledged that he never interacted with the couple, that they never turned around, that he observed them to be seated several rows away from him, and that he shot them in the back of the head.  He never claimed any visual hallucinations that they were physically closer to him or looking at him.  None of this suggests he perceived an imminent threat to himself.  Joseph also explained that he did "not necessarily" feel like they were a threat up until the point when he shot them but said he "wasn't thinking."  Later he testified that he did not believe he had to shoot them, but rather it was an idea the voices gave him, and he said it was a choice he made after struggling with the decision.

His friends' testimony also does not reflect that Joseph perceived an imminent threat from Goodrich and Barajas.  The layout of the theater required Joseph to walk down a set of stairs past where the couple was sitting to exit the theater.  Yet both Ramon and Carlos testified that Joseph did not interact with the couple when he walked in or out of the theater,

---

[5]    Ramon confirmed this timeframe, testifying that they waited outside for 10 to 15 minutes before seeing Joseph run out.

gesture to his friends in the reference to the couple, or walk with a sense of urgency as he passed them. Joseph also did not express any kind of concern for his friends, or say anything such as "be careful" or "you guys need to get out of here." His friends felt he was staring at or just past them, as opposed to at the couple.

Joseph points to his testimony that at some point he saw "little laser dots" and believed the two people in the theater were carrying handguns. While this might be some evidence in support of his argument, in light of all the other evidence it hardly *compels* a conclusion that he subjectively perceived an imminent threat.

In support of his insanity argument, Joseph relies primarily on the expert testimony that the auditory hallucinations compelled him to believe he was morally justified in carrying out the shooting. According to Joseph, as "[b]oth Drs. Bosch and Goldberg explained, even if the voices waned, the delusional belief that there was a threat, and that there was a need to act, persisted." Plaintiff contends this is the rare case where the expert evidence of insanity is uncontested and, thus, the question on appeal is not so much the substantiality of the evidence favoring the trier of fact's finding as whether the evidence contrary to that finding is of such weight and character that the trier of fact could not reasonably reject it. (See *Powell, supra*, 5 Cal.5th at p. 956, citing *People v. Drew* (1978) 22 Cal.3d 333, 351 (*Drew*); *People v. McCarrick* (2016) 6 Cal.App.5th 227, 247–248.)

As an initial matter, a court is not required to reach a verdict that comports with expert opinion. (*Drew, supra,* 22 Cal.3d at p. 350.) In fact, our high court has frequently upheld verdicts which found a defendant to be sane in the face of contrary unanimous expert opinion. (*Ibid.*) As in all cases involving expert testimony, the trier of fact may assess the material upon

31

which the opinion is based and the reasoning that purportedly justifies the expert's opinion. (*Id.* at pp. 350–351.)

Here, both experts grounded their opinions on the fact that Joseph believed his friends and family were being threatened, but both experts also implied that the threat to Joseph's friends and family was not so much imminent as inevitable. Both experts were probed as to whether it impacted their insanity opinions that Joseph said the voices ceased 10 to 15 minutes before the shooting. Dr. Bosch explained that delusions are fixed beliefs, so even if the voices stopped, the delusional ideation continues. As a result, Joseph felt this was his only option, and his mental illnesses prevented him from recognizing other options such as leaving the theater. Bosch opined that his mental defects overrode his sense of morality.

Dr. Goldberg agreed that even after the hallucinations stopped, the perceived threat remained, as did Joseph's feeling that he was compelled to act. Goldberg said hallucinations and delusions may decrease in intensity, but they are still there. In his view, having Joseph's friends leave just exacerbated the situation because that left him lost in his own thoughts, fantasies, and perceptions of reality. As a result, he too concluded that Joseph's schizophrenia overcame his sense of morality.

The prosecutor proposed to Dr. Goldberg that the incident with Joseph's father was different because he and his sister's kids were in the home with the father, and the voices were incessantly telling him he had to kill his dad. In other words, in Joseph's mind, they were under imminent threat of great bodily injury or death. Goldberg disagreed, explaining that he viewed the episodes as "exactly parallel." Even though the voices did not persist right up until Joseph acted in the theater, Goldberg viewed the incidents as the same because Joseph did not see any other way out and felt

32

he had no other option but to kill. He did not address whether the fact that a subject of the delusion, Joseph's niece, was present for the first incident, but that Joseph's friends and family were not in the theater for the second, was something he considered relevant.

The problem is that while the experts' opinions focus on inevitability, they arguably fail to account for the imminence requirement. Our Supreme Court has long held that for the threat to be imminent, " ' "[t]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*" . . . [¶] This definition of imminence reflects the great value our society places on human life.' " (*In re Christian S.* (1994) 7 Cal.4th 768, 783.)

We are aware of no authority indicating this same definition of imminence should not be applied when considering an insanity defense based on defense of self or others. Thus, the trial court reasonably could conclude that, under the legal standard requiring an imminent threat to establish the need for self-defense, Joseph's attacks on his father and the couple in the theater were not the same. And it could discount Dr. Goldberg's testimony as failing to reconcile the facts with the applicable legal standard. The same would be true of both experts' failure to grapple with the evidence that Joseph's friends had left the theater, Goodrich and Barajas were seated several rows away, and Joseph shot them in the back of the head. Even if he believed he had no choice and would have to confront them eventually, the legal standard requires that he view them as an imminent threat at the time of the killing. (*Cf. Rittger, supra*, 54 Cal.2d at p. 734 [declining to find insanity where the defendant claimed, according to his own distorted standards, that he was justified in killing another inmate based on the

33

inmate's threat that he might attack the defendant "*at some future time*"], italics added.)  Although the expert testimony in this case highlights that there may be a disconnect between our developing understanding of the realities of mental illness and the relevant legal standard, we are constrained by the latter.[6]

Joseph contends this court should be guided by *People v. Duckett* (1984) 162 Cal.App.3d 1115.  In *Duckett*, the defendant was found insane after shooting people at a college and was confined to a state mental hospital.  (*Id.* at p. 1118.)  Upon his release, he told a friend that he believed Faye Joiner was a witch who was practicing voodoo on him, and he planned to kill her.  (*Ibid.*)  The next month, he bought a shotgun and practiced firing it.  (*Ibid.*)  He said he thought about shooting Joiner because she "would not let [him] live."  (*Ibid.*)  He drove to her home one night, waited an hour or two for her to return home, and then asked her if she was going to leave him alone.  (*Ibid.*)  She purportedly responded, "hell no, fuck you," so he shot her and drove away.  (*Ibid.*)

At the sanity phase of the trial, three experts testified that Duckett suffered from chronic paranoid schizophrenia and, as a result, he could "neither substantially appreciate the criminality of his conduct nor conform

_____

[6]    As the *Drew* court commented, "inadequacy of the expert evidence to prove insanity under the *M'Naghten* rule is essentially the result of the fact that *M'Naghten* requires proof of a subjective cognitive state which is largely unrelated to the reality of mental illness." (*Drew, supra*, 22 Cal.3d at p. 351.) Studies show exaggeration of several cognitive biases in populations with delusions indicates these individuals have an impaired capacity for moral reasoning. (Johnston & Leahey, *The Status and Legitimacy of M'Naghten's Insane Delusion Rule* (2021) 54 U.C. Davis L. Rev. 1777, 1823 (Johnston & Leahey).)  But whether California insanity law should be reformed is not the issue before us in this case.

his conduct to the requirements of the law." (*Duckett, supra*, 162 Cal.App.3d at pp. 1119, 1123.) One expert explained that Duckett genuinely believed Joiner was going to kill him unless he killed her first. (*Id.* at p. 1121.) Although the jury found Duckett sane, the appellate court reversed, finding the expert testimony of Duckett's insanity was of such weight and character that the jury could not reasonably reject it. (*Id.* at pp. 1120, 1123.) The court also explained that it based its reversal on the independent ground that the prosecutor made an incurably prejudicial remark misstating the law regarding hospital commitments following an insanity verdict. (*Id.* at pp. 1123–1124.)

We are not persuaded that *Duckett* mandates a different result here. Initially, although the court did not make clear which definition of insanity it applied, the experts' opinions suggest the court applied the American Law Institute (ALI) test instead of the *M'Naghten* rule that is relevant here. From at least 1864, in *People v. Coffman* (1864) 24 Cal. 230, California courts used the *M'Naghten* test to frame the definition of insanity. (*Skinner, supra*, 39 Cal.3d at p. 768.) In 1978, our high court decided in *Drew, supra*, 22 Cal.3d 333 to discard the *M'Naghten* rule and utilize the ALI test because it comported with then-current legal and psychological thought and had been widely adopted by other jurisdictions. (*Id.* at pp. 336, 345.) This test specified that " '[a] person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of law.' " (*Id.* at

p. 345.)  But in June 1982 the California electorate adopted an initiative measure (Proposition 8) that, among other things, restored the *M'Naghten* definition of insanity.[7]  (*Skinner, supra*, 39 Cal.3d at p. 768.)

It also is not clear from the *Duckett* opinion whether the test it employed allowed a finding of insanity based on self-defense or defense of others.  Even if it did, this case appears distinguishable in that the threat was more imminent—the woman Duckett perceived to be a witch who wanted to kill him was right in front of him and confirmed that she was not going to leave him alone.

The uncertainties of *Duckett* notwithstanding, we are not persuaded this is one of the " 'rare case[s] when "the evidence is uncontradicted and entirely to the effect that the accused is insane" [citation], that a unanimity of expert testimony could authorize upsetting a jury finding to the contrary.' " (*Drew, supra*, 22 Cal.3d at p. 350.)  Both experts testified that Joseph struggled with the morality of killing Goodrich and Barajas.  Dr. Bosch made clear that Joseph knew it was legally and morally wrong to do so.  For his part, Dr. Goldberg stated that it would not be insanity if the voices had just told a person like Joseph to kill someone without any threat of something happening to him or his loved ones.  Thus, the court could reasonably conclude that, absent credible and persuasive evidence that Joseph believed there was an imminent threat to himself or his friends and family, both

---

[7]     Although the new statutory test set for the in Penal Code section 25, subdivision (b) required the accused person to prove "by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act *and* of distinguishing right from wrong at the time of the commission of the offense," the *Skinner* court determined in 1985 that the electorate intended to restore the *M'Naghten* rule, which listed the two prongs in the disjunctive ("or" versus "and").  (*Skinner, supra*, 39 Cal.3d at p. 769, italics added.)

experts would have agreed he understood the killings were morally wrong and would not meet the definition of insanity. Given that their testimony did not, in fact, adequately address the legal definition of an imminent threat or its impact on their theory that his deluded compulsion to defend his friends and family overrode his morality, the court could reasonably discount their opinions and conclude the defense had not presented sufficient evidence of insanity as that concept is legally defined.

The trial court placed significant weight on the evidence that Joseph stole Goodrich's wallet and the experts' lack of a satisfactory explanation for this fact. In particular, the court was troubled by Dr. Bosch's responses to some of the prosecutor's hypothetical questions. Our review of the transcript reveals there may have been an initial misunderstanding between the prosecutor and Bosch as to whether he was asking her to assume Joseph did not suffer from any mental illness at all. We need not evaluate the impact of this misunderstanding, though, because the lack of an imminent threat provides sufficient grounds for affirming.

In sum, construing the facts in the light most favorable to the judgment, we conclude substantial evidence supports the court's conclusion that Joseph was legally sane under the applicable legal standard at the time of the murders.

## DISPOSITION

The judgment is affirmed.

DATO, J.

I CONCUR:

McCONNELL, P. J.

CASTILLO, J., Concurring in the result.

Like the majority, I agree substantial evidence supports the trial court's conclusion that Joseph Jimenez was legally sane at the time he killed Rylee Goodrich and Anthony Barajas and would therefore also affirm. (Maj. opn., at p. 37.) I concur in the result only, however, because I would not rely on *People v. Leeds* (2015) 240 Cal.App.4th 822 to reach this result. Similar to here, the *Leeds* defendant pled not guilty by reason of insanity to multiple murder charges, claiming he was legally justified in shooting the victims because, in his delusional state, he believed they were conspiring to kill him. (*Leeds*, 240 Cal.App.4th at p. 824.) *Leeds* determined the trial court misinstructed the jury, which "should have been instructed on self-defense modified in the context of insanity: [the defendant] was legally insane if, because of a mental disease or defect that [the defendant] had when [the defendant] committed the crimes, [the defendant] actually believed that [the defendant] was in imminent danger of being killed or suffering great bodily injury and that the immediate use of deadly force was necessary to defend against the danger." (*Id.* at p. 832.) As support for its statement of the rule underlying the insanity defense, *Leeds* cited the pattern jury instruction for imperfect or unreasonable self-defense and *People v. Elmore* (2014) 59 Cal.4th 121, 140. (*Leeds*, at p. 832.)

But *Elmore* does not support grafting the self-defense framework—including its imminence requirement—onto the insanity defense. Indeed, *Elmore* held that "[u]nreasonable self-defense and legal insanity are distinct theories, and *must be adjudicated separately*." (*Elmore*, 59 Cal.4th at p. 146, italics added.)

To successfully claim self-defense, a defendant must fear "*imminent danger to life or great bodily injury*." (*In re Christian S.* (1994) 7 Cal.4th 768,

783.) "The peril must appear to the defendant as immediate and present and not prospective or even in the near future. An imminent peril is one that, from appearances, must be instantly dealt with." (*Ibid.* [cleaned up], italics omitted.) Imminence is thus a critical component of self-defense. An insanity defense, on the other hand, appears not to require imminence, at least as framed by leading authorities. In *Elmore*, for example, our high court recognized that "[a] claim of unreasonable self-defense based solely on delusion is quintessentially a claim of insanity under the *M'Naghten*[*'s Case* (1843) 8 Eng.Rep. 718] standard of inability to distinguish right from wrong. Its rationale is that mental illness caused the defendant to perceive an illusory threat, form an actual belief in the need to kill in self-defense, and act on that belief without wrongful intent." (*Elmore*, 59 Cal.4th at p. 140.) Absent from this statement of the insanity defense is any mention of imminence. *M'Naghten*, on which California's insanity defense is premised, is equally silent on this score. (*M'Naghten*, at p. 723 ["[I]f under the influence of [a] delusion [the defendant] supposes another [person] to be in the act of attempting to take away [the defendant's] life, and [the defendant] kills that [person], as [the defendant] supposes, in self-defen[s]e, [the defendant] would be exempt from punishment."].)

*Leeds'* basis for shoehorning the insanity defense into a modified rule of self-defense, with its attendant imminence requirement, is thus unclear. Self-defense's imminence requirement obliges a defendant to synthesize the facts as they appear to the defendant, determine the likelihood and immediacy of any potential harm, and decide on that basis whether instantaneous action is needed. (*Christian S.*, 7 Cal.4th at p. 783.) I worry a defendant claiming the discrete defense of insanity may not necessarily possess the wherewithal to engage in such subjective calculation. Absent

2

further clarification from the Supreme Court, I would therefore avoid resolving this matter under *Leeds*' test.

Instead, I would conclude Jimenez was not legally insane because he could appreciate right and wrong and discern between them at the time he shot Goodrich and Barajas. As the majority recognizes, "[b]oth experts [in this matter] testified that J[imenez] struggled with the morality of killing" Goodrich and Barajas, and one expert "made clear that J[imenez] knew it was legally and morally wrong to" kill them. (Maj. opn., at p. 36.) Among other factors, Jimenez heard no voices in the ten to fifteen minutes directly preceding the shooting but nonetheless shot both victims, took Goodrich's wallet, shot Goodrich again, quickly ran from the scene, and placed the money from Goodrich's wallet into his own. On such facts, I would conclude Jimenez did not carry his burden of proving he was insane at the time he killed Goodrich and Barajas.

For these reasons, I respectfully concur in the result only.


CASTILLO, J.

3